THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TOWN OF ATLANTA, INDIANA, | ) | CIVIL ACTION NO.  1:18-cv-54 |
| | ) | |
| Plaintiff, | ) | **COMPLAINT** |
| | ) | |
| v. | ) | Complaint for Public Nuisance; Violations |
| | ) | of Indiana Corrupt Business Influence Act |
| CARDINAL HEALTH, INC., | ) | (Indiana RICO); Violations of Indiana |
| AMERISOURCEBERGEN DRUG | ) | Deceptive Practices Act; Negligence, |
| CORPORATION, and | ) | Negligence Per Se; Drug Dealer Liability |
| McKESSON CORPORATION, | ) | Act; Civil Conspiracy; Fraud and |
| | ) | Fraudulent Misrepresentation; |
| Defendants. | ) | and Deception under Indiana's Crime |
| | ) | Victims Relief Act |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

I.   INTRODUCTION......................................................................................... 1

II.  PARTIES .................................................................................................... 2

    A.  **Plaintiff, Town of Atlanta** ............................................................... 2

    B.  **Defendants**........................................................................................ 3

        1. **Distributor Defendants**............................................................... 3

III. **JURISDICTION AND VENUE**............................................................... 6

IV.  **FACTUAL BACKGROUND**.................................................................... 7

    A.  **The Opioid Epidemic** ........................................................................ 7

        1. **The National Opioid Epidemic** .................................................... 7

        2. **Indiana's Opioid Epidemic** ......................................................... 11

        3. **Plaintiff's Opioid Epidemic** ....................................................... 12

    B.  **The Distributor Defendants' Unlawful Distribution of Opioids** ............................ 13

        1. **The Distributor Defendants Have a Duty under Federal and State Law to
          Guard Against, and Report, Unlawful Diversion, and to Report and Prevent
          Suspicious Orders** ........................................................................... 15

        2. **The Distributor Defendants Breached Their Duties.** ........................................ 22

**3. The Distributor Defendants Have Sought to Avoid and Have Misrepresented Their Compliance with Their Legal Duties**............................................................ 25

**C. Distributor Defendants' Unlawful Conduct and Breaches of Legal Duties Caused the Harm Alleged Herein and Substantial Damages**.................................. 33

**D. Statutes of Limitations Are Tolled and Distributor Defendants Are Estopped from Asserting Statutes of Limitations as Defenses** ......................................... 35

   **1. Continuing Conduct.** .................................................................................... 35

   **2. Equitable Estoppel**..................................................................................... 36

   **3. Fraudulent Concealment**............................................................................ 37

**V. LEGAL CAUSES OF ACTION** ............................................................................... 38

   **COUNT I**      **PUBLIC NUISANCE**.................................................................. 38

   **COUNT II**     **INDIANA CRIME VICTIM RELIEF ACT INDIANA CODE SECTION 34-24-3-1 (Deception)** ...................................... 47

   **COUNT III**    **NEGLIGENCE AND NEGLIGENT MISREPRESENTATION**........................................................ 48

   **COUNT IV**   **NEGLIGENCE PER SE** ............................................................. 51

   **COUNT V**    **DECEPTIVE TRADE PRACTICES COMMON LAW AND INDIANA CODE CHAPTER 24-5-0.5-2** .................................. 52

   **COUNT VI**   **CIVIL CONSPIRACY** ................................................................ 53

   **COUNT VII**  **DRUG DEALER LIABILITY INDIANA CODE SECTION 34-24-4-1**....................................................................... 55

   **COUNT VIII** **FRAUD AND FRAUDULENT MISREPRESENTATION** ................... 56

**VI. PUNITIVE DAMAGES** ......................................................................................... 57

**VII. RELIEF**............................................................................................................... 58

Plaintiff, TOWN OF ATLANTA, INDIANA ("Plaintiff"), brings this Complaint against Defendants Cardinal Health, Inc. ("Cardinal"), AmerisourceBergen Drug Corporation ("AmerisourceBergen"), and McKesson Corporation ("McKesson") (collectively "Defendants") and alleges as follows:

## I.      INTRODUCTION

1.      Plaintiff brings this civil action to eliminate the hazard to public health and safety caused by the opioid epidemic, to abate the nuisance caused thereby, and to recoup monies spent because of Defendants' false, deceptive and unfair marketing and/or unlawful diversion of prescription opioids.[1]  Such pecuniary damages were foreseeable to Defendants and were sustained because of Defendants' intentional and/or unlawful actions and omissions.

2.      Opioid analgesics are widely diverted and improperly used, and the widespread abuse of opioids has resulted in a national epidemic of opioid addiction and deaths due to opioid overdose.[2]

3.      The opioid epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[3]

4.      Plaintiff brings this suit against the wholesale distributors of these highly addictive prescription drugs. Plaintiff does not bring any product liability claims or causes of action and does not seek compensatory damages for death, physical injury to person, or emotional distress. Plaintiff does not bring common law claims for property damage.

---

[1] As used herein, the term "opioid" refers to the entire family of opiate drugs including natural, synthetic, and semi-synthetic opiates.

[2] *See* Nora D. Volkow & A. Thomas McLellan, *Opioid Abuse in Chronic Pain – Misconception and Mitigation Strategies*, 374 N. Eng. J. Med. 1253 (2016).

[3] *See* Robert M. Califf et al., *A Proactive Response to Prescription Opioid Abuse*, 374 N. Eng. J. Med. 1480 (2016).

5.      The distributors intentionally, recklessly, and unlawfully breached their legal duties under federal and state law which obligated them to monitor, detect, investigate, refuse, and report suspicious orders of prescription opiates.  Despite the clear evidence before their eyes—that the number of opioids being sent into communities like the Plaintiff's Community could not be explained or justified by any conceivable medical need, but could only be explained by a flourishing and rapidly expanding black market for opioids—these wholesale distributors continued to push their substances into the community, willingly and knowingly becoming participants in the black market they were fueling.

## II.      PARTIES

### A.  Plaintiff Town of Atlanta, Indiana

6.      Plaintiff is a municipal corporation organized under Indiana law. *See* Ind. Code § 36-1-2-10.

7.      Plaintiff has declared, *inter alia*, that opioid abuse, addiction, morbidity and mortality has created a serious public health and safety crisis within its territorial boundaries, and is a public nuisance, and that the diversion of legally produced controlled substances into the illicit market causes or contributes to this public nuisance.

8.      The distribution and diversion of opioids into Indiana (the "State"), and into the Town of Atlanta and surrounding areas (collectively, "Plaintiff's Community"), created the foreseeable opioid crisis and opioid public nuisance for which Plaintiff here seeks relief.

9.      Plaintiff directly and foreseeably sustained all economic damages alleged herein.

10.      Defendants' conduct has exacted a financial burden for which the Plaintiff seeks relief.  Categories of past and continuing sustained damages include, *inter alia*, (1) costs for providing medical and therapeutic care, prescription drug purchases, and other treatments for

2

patients suffering from opioid-related addiction or disease, including overdoses and deaths; (2) costs for providing treatment, counseling, and rehabilitation services; (3) costs for providing treatment for infants born with opioid-related medical conditions; (4) costs associated with law enforcement and public safety efforts relating to the opioid epidemic; and (5) costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation. These damages have been suffered, and continue to be suffered, by the Plaintiff.

11.     Plaintiff also seeks the means to abate the epidemic created by Defendants' wrongful and unlawful conduct. Plaintiff is authorized by law to abate any nuisance, and prosecute in any court of competent jurisdiction, any person who creates, continues, contributes to, or suffers such nuisance to exist and prevent injury and annoyance from such nuisance. Ind. Code § 32-30-6-7.

12.     Plaintiff has standing to recover damages incurred as a result of Defendants' actions and omissions. Plaintiff has standing to bring all claims pled herein, including, *inter alia*, standing under Indiana Code section 34-24-3-1 to recover damages caused by certain criminal acts, pursuant to Indiana Code section § 34-6-2-103 ("person" includes "a governmental entity") and Indiana Code section 34-6-2-49 ("governmental entity" means "the state or a political subdivision of the state"); standing to recover damages under the Deceptive Consumer Sales Act pursuant to Ind. Code Ann. § 24-5-0.5-2 ("person" includes "the state of Indiana or its subdivisions or agencies" "or any other legal entity"); and standing to bring claims under Indiana Code section 34-24-4-1 (which specifically grants standing to "governmental entit[ies]," Ind. Code § 34-24-4-2).

### B. Defendants

#### 1. Distributor Defendants

13. The Distributor Defendants are individually defined below. At all relevant times, the Distributor Defendants distributed, supplied, sold, and placed prescription opioids into the stream of commerce, without fulfilling the fundamental duty of wholesale drug distributors to detect and warn the U.S. Drug Enforcement Administration ("DEA") of the likely diversion and use of dangerous drugs for non-medical purposes. The Distributor Defendants universally failed to comply with federal and/or state law. This unlawful conduct by the Distributor Defendants is responsible for the volume of prescription opioids plaguing Plaintiff's Community.

14. Distributor Defendant McKESSON CORPORATION ("McKesson") operated as a licensed pharmacy wholesaler in Indiana, at all relevant times. McKesson is registered with the Indiana Secretary of State as a Delaware corporation. McKesson has its principal place of business located in San Francisco, California.

15. Distributor Defendant CARDINAL HEALTH, INC. ("Cardinal") at all relevant times, operated as a licensed pharmacy wholesaler in Indiana. Cardinal is an Ohio corporation, with its principal office located in Dublin, Ohio.

16. Distributor Defendant AMERISOURCEBERGEN DRUG CORPORATION ("AmerisourceBergen") operated as a licensed pharmacy wholesaler in Indiana, at all relevant times. AmerisourceBergen is registered with the Indiana Secretary of State as a Delaware corporation. AmerisourceBergen's principal place of business is located in Chesterbrook, Pennsylvania.

17. The data that reveals and/or confirms the identity of each wrongful opioid distributor is not publicly available, but rather is stored in the DEA's confidential Automation of Reports and Consolidated Orders System ("ARCOS") database. *See Madel v. USDOJ*, 784 F.3d

4

448 (8th Cir. 2015).  Neither the DEA[4] nor the wholesale distributors[5] will voluntarily disclose the data necessary to identify with specificity the transactions that will form the evidentiary basis for the claims asserted herein.

18.     Consequently, Plaintiff has named as Defendants the three (3) wholesale distributors that dominate 85% of the market share for the distribution of prescription opioids nationwide (i.e., AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation), and upon information and belief they hold a similar dominant share of the market in Indiana.  These "Big 3" are Fortune 500 corporations listed on the New York Stock Exchange whose principal business is the nationwide wholesale distribution of prescription drugs.  *See Fed. Trade Comm'n v. Cardinal Health Inc.*, 12 F. Supp. 2d 34, 37 (D.D.C. 1998) (describing Cardinal Health, Inc., McKesson Corporation, and AmerisourceBergen Drug Corporation predecessors). Each has been investigated and/or fined by the DEA for their failure to report suspicious pharmaceutical orders.  Plaintiff has reason to believe each engaged in unlawful conduct in Indiana, resulting in the diversion of prescription opioids in Plaintiff's Community, and that the discovery process will reveal other entities who, likewise, engaged in unlawful conduct in relation to Plaintiff's opioid epidemic.

19.     Thus, Plaintiff names each of the Amerisource Bergen, Cardinal, and McKesson as defendants and places the industry on notice that the Plaintiff is acting to abate the public nuisance plaguing Plaintiff's Community.  Plaintiff will request expedited discovery pursuant to Rule 26(d)

---

[4] *See* Declaration of Katherine L. Myrick, Chief, Freedom of Information (FOI)/Privacy Act Unit ("SARF"), FOI, Records Management Section ("SAR"), Drug Enforcement Administration (DEA), United States Department of Justice (DOJ), *Madel v. USDOJ*, Case 0-:13-cv-02832-PAM-FLN, (Document 23) (filed 02/06/14) (noting that ARCOS data is "kept confidential by the DEA").
[5] *See* Declaration of Tina Lantz, Cardinal Health VP of Sales Operation, *Madel v. USDOJ*, Case 0:13-cv-02832-PAM-FLN, (Document 93) (filed 11/02/16) ("Cardinal Health does not customarily release any of the information identified by the DEA notice letter to the public, nor is the information publicly available.  Cardinal Health relies on DEA to protect its confidential business information reported to the Agency.").

of the Federal Rules of Civil Procedure to secure the data necessary to reveal and/or confirm the identities of the wholesale distributors, including data from the ARCOS database.

### III.     Jurisdiction and Venue

20.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332.  Complete diversity exists because the Town of Atlanta is a citizen of Indiana, and none of the Defendants are citizens of Indiana.  McKesson is a citizen of Delaware (its state of incorporation) and California (its principal place of business); Cardinal Health is a citizen of Ohio (its state of incorporation as well as its principal place of business); and AmerisourceBergen is a citizen of Delaware (its state of incorporation) and Pennsylvania (its principal place of business).  Plaintiff seeks damages from Defendants to compensate it for the incredible damage done in Plaintiff's Community, and this amount exclusive of interest and costs greatly exceeds $75,000.

21.     This Court additionally has subject matter jurisdiction under 28 U.S.C. § 1331 based upon the claims asserted herein under the duties imposed on Defendants by federal Controlled Substances Act. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Plaintiff's federal claims that they form part of the same case or controversy.

22.     This Court has personal jurisdiction over Defendants because they conduct business in Indiana, purposefully direct or directed their actions toward Indiana, consented to be sued in Indiana by registering an agent for service of process, consensually submitted to the jurisdiction of Indiana when obtaining a distributor license, and have the requisite minimum contacts with Indiana necessary to constitutionally permit the Court to exercise jurisdiction.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District and

6

each Defendant transacted affairs and conducted business that gave rise to the claim of relief in this District.

## IV.     Factual Background

### A.  The Opioid Epidemic

1.   The National Opioid Epidemic

24.     The past two decades have been plagued by increasing instances of abuse and diversion of prescription drugs, including opioid medications, in the United States.[6]

25.     Prescription opioids have become widely prescribed, with U.S. sales nearly quadrupling from 1999 to 2014.[7] By 2010, enough prescription opioids were sold across the United States to medicate every U.S. adult with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.[8]

26.     By 2011, the U.S. Department of Health and Human Resources, Centers for Disease Control and Prevention, declared prescription painkiller overdoses had reached epidemic levels, noting:

a.  The death toll from overdoses of prescription painkillers has more than tripled in the past decade.

b.  More than 40 people die every day from overdoses involving narcotic pain relievers like hydrocodone (Vicodin), methadone, oxycodone (OxyContin), and oxymorphone (Opana).

c.  Overdoses involving prescription painkillers are at epidemic levels and now kill more Americans than heroin and cocaine combined.

d.  The increased use of prescription painkillers for nonmedical reasons, along with growing sales, has contributed to a large number of overdoses and deaths.  In

---

[6] *See* Richard C. Dart et al, *Trends in Opioid Analgesic Abuse and Mortality in the United States*, 372 N. Eng. J. Med. 241 (2015).

[7] Centers for Disease Control and Prevention. *Vital Signs: Overdoses of Prescription Opioid Pain Relievers — United States, 1999—2008*. MMWR 2011; 60(43);1487-1492 (November 4, 2011), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6043a4.htm?s_cid=mm6043a4_w%20-%20fig2.

[8] Katherine M. Keyes et al., *Understanding the Rural-Urban Differences in Nonmedical Prescription Opioid Use and Abuse in the United States*, 104 Am. J. Pub. Health e52 (2014).

2010, 1 in every 20 people in the United States age 12 and older – a total of 12 million people – reported using prescription painkillers non-medically according to the National Survey on Drug Use and Health. Based on the data from the Drug Enforcement Administration, sales of these drugs to pharmacies and health care providers have increased by more than 300 percent since 1999.

e. Prescription drug abuse is a silent epidemic that is stealing thousands of lives and tearing apart communities and families across America.

f. Almost 5,500 people start to misuse prescription painkillers every day.[9]

27. In 2016, the President of the United States declared an opioid and heroin epidemic.[10]

28. The number of annual opioid prescriptions written in the United States is now roughly equal to the number of adults in the population.[11]

29. Many Americans are now addicted to prescription opioids, and the number of deaths due to prescription opioid overdose is deplorable. In 2016, drug overdoses killed 64,070 people in the United States, an increase of more than 22% from the previous year.[12] Opioids are the main driver of drug overdose deaths in the United States.[13]

30. Moreover, the CDC has identified addiction to prescription pain medication as the strongest risk factor for heroin addiction, reporting that people who are addicted to prescription opioid painkillers are 40 times more likely to be addicted to heroin.[14]

---

[9] *See* Press Release, Ctrs. For Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Prescription Painkiller Overdoses at Epidemic Levels (Nov. 1, 2011), *available at* https://www.cdc.gov/media/releases/2011/p1101_flu_pain_killer_overdose.html.

[10] *See* Proclamation No. 9499, 81 Fed. Reg. 65,173 (Sept. 16, 2016) (proclaiming "Prescription Opioid and Heroin Epidemic Awareness Week").

[11] *See* Robert M. Califf et al., *A Proactive Response to Prescription Opioid Abuse*, 374 N. Eng. J. Med. 1480 (2016).

[12] *See* Ctrs. For Disease Control and Prevention, U.S.Dep't of Health and Human Servs., Provisional Counts of Drug Overdose Deaths, (August 8, 2016), https://www.cdc.gov/nchs/data/health_policy/monthly-drug-overdose-death-estimates.pdf.

[13] *See* Ctrs. For Disease Control and Prevention, U.S.Dep't of Health and Human Servs., Opioid Overdose, (December 16, 2016), https://www.cdc.gov/drugoverdose/data/statedeaths.html

[14] *See* Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., *Today's Heroin Epidemic*, https://www.cdc.gov/vitalsigns/heroin/index.html (last updated July 7, 2015).

8

31.     Heroin is pharmacologically similar to prescription opioids.  The majority of current heroin users report having used prescription opioids non-medically before they initiated heroin use.  Available data indicates that the nonmedical use of prescription opioids is a strong risk factor for heroin use.[15]

32.     The CDC reports that drug overdose deaths involving heroin continue to climb sharply, with heroin overdoses more than tripling in 4 years.  This increase mirrors large increases in heroin use across the country and is shown to be closely tied to the misuse of and dependence on opioids. Research is clear, **past misuse of prescription opioids is the strongest risk factor for heroin initiation and use,** specifically among persons who report dependence or abuse in the past year.  The increased availability of heroin, combined with its low price (as compared to diverted prescription opioids) and high drug purity appear to be major drivers of the upward trend in heroin and overdose.[16]

33.     The societal costs of prescription drug abuse are "huge."[17]

34.     Across the nation, local governments are struggling with a pernicious, ever-expanding epidemic of opioid addiction and abuse.  Every day, more than 90 Americans lose their lives after overdosing on opioids.[18]

---

[15] *See* Wilson M. Compton, *Relationship Between Nonmedical Prescription-Opioid Use and Heroin*, 374 N. Eng. J. Med. 154 (2016).

[16] *See* Rose A. Rudd et al., *Increases in Drug and Opioid Overdose Deaths – United States*, 2000-2014, 64 Morbidity & Mortality Wkly. Rep. 1378 (2016).

[17] *See* Amicus Curiae Brief of Healthcare Distribution Management Association in Support of Appellant Cardinal Health, Inc., *Cardinal Health, Inc. v. United States Dep't of Justice*, No. 12-5061 (D.C. Cir. May 9, 2012), 2012 WL 1637016, at *10 (hereinafter Brief of HDMA).

[18] Opioid Crisis, NIH, National Institute on Drug Abuse (available at https://www.drugabuse.gov/drugs-abuse/opioids/opioid-crisis, last visited Sept. 19, 2017) ("Opioid Crisis, NIH") (citing at note 1 Rudd RA, Seth P, David F. Scholl L. Increases in Drug and Opioid-Involved Overdose Deaths – United States, 2010 – 2015, *MMWR MORB MORTAL WKLY REP.* 2016;65, doi:10.15585/mmwr.mm655051e1).

35.     The National Institute on Drug Abuse identifies misuse and addiction to opioids as "a serious national crisis that affects public health as well as social and economic welfare."[19]  The economic burden of prescription opioid misuse alone is $78.5 billion per year, including the costs of healthcare, lost productivity, addiction treatment, and criminal justice expenditures.[20]

36.     The U.S. opioid epidemic is continuing, with opioid overdoses quadrupling between 1999 and 2015. Nonfatal opioid overdoses requiring medical care in a hospital or emergency department increased by a factor of six in the past 15 years.[21] Further, among the 52,404 drug overdose deaths occurring across the U.S. in 2015, 33,091 (63.15%) involved an opioid.[22]

37.     Every day brings a new revelation regarding the depth of the opioid epidemic. To name just one example, the New York Times reported in September 2017 that the epidemic, which now claims 60,000 lives per year, is extending to babies and toddlers who are killed because ubiquitous, deadly opioids are "everywhere" and mistaken by children as candy.[23]

38.     All research and statistics on this subject make clear, deaths due to prescription pain medication and heroin overdoses are devastating families and communities across the country.[24] Meanwhile, the manufacturers and distributors of prescription opioids extract **billions of dollars of revenue** as a direct result of America's addictions. Public entities are, then, left to clean up the pieces, experiencing losses in the **tens of millions of dollars** in the way of public assistance

---

[19] Opioid Crisis, NIH.

[20] *Id.* (citing at note 2 Florence CS, Zhou C, Luo, F, Xu L, The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States, 2013, *MED CARE* 2016;54(10):901-906, doi: 10.1097/MLR.0000000000000625).

[21] *See* Nora D. Volkow & A. Thomas McLellan, *Opioid Abuse in Chronic Pain – Misconception and Mitigation Strategies*, 374 N. Eng. J. Med. 1253 (2016).

[22] *See* Ctrs. For Disease Control and Prevention, Opioid Overdose Drug Overdose Death Data, (December 16, 2016), https://www.cdc.gov/drugoverdose/data/statedeaths.html.

[23] Julie Turkewitz, ‘The Pills are Everywhere; : How the Opioid Crisis Claims Its Youngest Victims, N.Y. Times, Sept. 20, 2017 (“'It's a cancer,' said [grandmother of dead one-year old], of the nation's opioid problem, 'with tendrils that are going everywhere.'").

[24] *See* Presidential Memorandum – Addressing Prescription Drug Abuse and Heroin Use, 2015 Daily Comp. Pres. Doc. 743 (Oct. 21, 2015), https://www.gpo.gov/fdsys/pkg/DCPD-201500743/pdf/DCPD-201500743.pdf.

necessary to protect and heal their communities. These losses are a reasonably foreseeable consequence of the prescription opioid epidemic. So far, distributors like the Defendants have felt free to treat these losses as an economic externality—the Defendants collect the monetary gain associated with maximizing the sale and distribution of prescription beyond any medical needs, while pushing the bill for the costs created by their behavior onto local communities and governmental entities like the Plaintiff.

39.     The prescription opioid manufacturers and distributors, including the Defendants, have continued their wrongful, intentional, and unlawful conduct, despite knowing their conduct is causing and/or contributing to the national, state, and local opioid epidemic.

## 2.   Indiana's Opioid Epidemic

40.     Indiana has been especially impacted by the national opioid crisis.

41.     Indiana has an opioid prescription rate of 109.1 per 100 persons, which ranks ninth in the country (the median rate for states is 82.5) and a benzodiazepine prescription rate of 42.9 per 100 persons, which ranks seventeenth nationally (the median rate for states is 37.7).[25]

42.     Indeed, "In Indiana opioid overdose deaths rose 52 percent between 2015 and 2016 and have more than double in the last three years."[26]

43.     The inevitable result has been a drain on state and local resources: over the same period, drug-related arrests by Indiana State Police have increased by more than 40 percent.[27]

---

[25] See Leonard J. Paulozzi, M.D., et al., Vital Signs: Variation Among States in Prescribing of Opioid Pain Relievers and Benzodiazepines – United States, 2012, Morbidity and Mortality Weekly Report, Centers for Disease Control and Prevention, U.S. Department of Health and Human Services (July 4, 2014). The combination of hydrocodone, oxycodone, and benzodiazepines is referred to as the "holy trinity" and significantly increases the risk of harm to those that abuse prescription pills.

[26] Indy-Star, Gov. Holcomb: Why I am focusing on the opioid crisis, *available at* https://www.indystar.com/story/news/2017/09/30/gov-holcomb-opioid-opioids-opioid-addiction-opioid-epidemic-opioid-withdrawal-opioid-overdose-pain-p/716337001/ (accessed December 12, 2017).

[27] *Id.*

11

44.     In the words of Indiana's Governor Eric Holcomb, communities across the state have been "ravaged."[28]

45.     Governor Holcomb has further noted that "our jails have become de facto detox facilities."[29]

46.     In fact, the recent human immunodeficiency virus (HIV) and hepatitis C outbreak in Scott County, Indiana, "**is the single largest known outbreak among persons who inject drugs . . . in the United States**."[30]

47.     The entire State has suffered as a result of the opioid epidemic. As just one indicator, there has been a marked increase in the number of opioid overdoses across Indiana from 2011–2015:



3.   <u>Plaintiff's Opioid Epidemic</u>

48.     The opioid epidemic is particularly devastating in Plaintiff's Community.

---

[28] *Id.*

[29] *Id.*

[30] Indiana State Dep. of Health, <u>County Profiles of Opioid Use and Related Outcomes</u>, available at https://www.in.gov/isdh/files/CountyProfilesOfOpioidUse2017.pdf.

49.     As just one example, the rate of chronic hepatitis C cases per 100,000 in population in Hamilton County (in which the Town of Atlanta is located) has **increased by over 35%** over the period 2011-2015.[31] Plaintiff has information that this incredible rise in hepatitis C is directly tied to opioid abuse and addiction, which in turn leads to heroin use and sharing needles.

50.     In the same period, incidents of non-fatal emergency department visits due to opioid overdoses per 100,000 in population **nearly doubled**.



51.     Again, this incredible harm to not just the victims of opioid addiction, but the communities in which those individuals lived, stems directly from the Defendants' intentional choice to pump opioids into Plaintiff's Community in violation of state and federal law.

### B.  The Distributor Defendants' Unlawful Distribution of Opioids

52.     The Distributor Defendants owe a duty under both federal law (21 U.S.C. § 823, 21 C.F.R. 1301.74) and Indiana law (Ind. Code ch. 25-26-14 *et seq.*) to monitor, detect, investigate,

---

[31] Indiana State Dep. of Health¸County Profiles of Opioid Use and Related Outcomes, available at https://www.in.gov/isdh/files/CountyProfilesOnOpioidAbuse2017.pdf.

21847146.1

refuse to fill, and report suspicious orders of prescription opioids originating from Plaintiff's Community as well as those orders which the Distributor Defendants knew or should have known were likely to be diverted into Plaintiff's Community.

53.    The foreseeable harm from a breach of these duties is the diversion of prescription opioids for nonmedical purposes.

54.    Each Distributor Defendant repeatedly and purposefully breached its duties under state and federal law.  Such breaches are a direct and proximate cause of the widespread diversion of prescription opioids for nonmedical purposes into Plaintiff's Community.

55.    The unlawful diversion of prescription opioids is a direct and proximate cause of the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality in the State and in Plaintiff's Community.

56.    The unlawful diversion of prescription opioids is a direct and proximate cause of the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality in the State and in Plaintiff's Community. This diversion and the epidemic are direct causes of harms for which Plaintiff seeks to recover here.

57.    The opioid epidemic in Indiana, including *inter alia* in Plaintiff's Community, remains an **immediate hazard to public health and safety**.

58.    The opioid epidemic in Plaintiff's Community is a temporary and continuous public nuisance and remains unabated.

59.    The Distributor Defendants intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the harms and damages alleged herein.

14

1.  The Distributor Defendants Have a Duty under Federal and State Law to Guard Against, and Report, Unlawful Diversion, and to Report and Prevent Suspicious Orders.

60. Opioids are a controlled substance and are categorized as "Legend drugs" under Indiana law.  *See* Ind. Code § 25-26-14-7. These "Schedule II" drugs are controlled substances with a "high potential for abuse." 21 U.S.C. §§ 812(b), 812(2)(A)-(C).

61. As wholesale drug distributors, each Distributor Defendant was required under Indiana law to obtain a license as wholesaler of controlled substances from the state board of pharmacy. Ind. Code § 25-26-14-14.  Each Distributor Defendant is licensed by the Indiana Board of Pharmacy and is a "registrant" or "licensee" as a wholesale distributor in the chain of distribution of Schedule II controlled substances and assumed a duty to comply with all security requirements imposed under the regulations adopted the Indiana Board of Pharmacy.

62. Each Distributor Defendant was, further, required to register with the DEA, pursuant to the federal Controlled Substance Act. *See* 21 U.S.C. § 823(b), (e); 28 C.F.R. § 0.100. Each Distributor Defendant is a "registrant" as a wholesale distributor in the chain of distribution of Schedule II controlled substances with a duty to comply with all security requirements imposed under that statutory scheme.  Those requirements are adopted and incorporated into Indiana law.

63. Each Distributor Defendant has an affirmative duty under federal and Indiana law to act as a gatekeeper guarding against the diversion of the highly addictive, dangerous opioid drugs. Federal law requires that Distributors of Schedule II drugs, including opioids, must maintain "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." 21 U.S.C. § 823(b)(1). Indiana incorporates these requirements through Indiana's licensing requirements on wholesale drug distributors, which require, "[a]s a condition for receiving and retaining a wholesale drug distributor license," any

15

wholesale legend drug distributor to "continuously maintain . . . [its o]perations in compliance with all federal legal requirements applicable to wholesale drug distribution." Ind. Code § 25-26-14-17(10).

64.     As a further condition for receiving and retaining their license, the Defendants are required by Indiana law to maintain "[a] reasonable system of record keeping . . . [that] provides for mandatory reporting of significant shortages or losses of legend drugs or counterfeiting to the board and the federal Food and Drug Administration, if applicable, **if diversion is known or suspected**." Ind. Code § 25-26-14-17(3)(G) (emphasis added).

65.     Wholesale legend drug distributors are further required to develop and adhere to policies and procedures that result in the "[i]nvestigation of discrepancies in the inventory involving . . . contraband, or suspected contraband legend drugs and reporting of discrepancies within three (3) business days to the [Indiana Board of Pharmacy] and any other appropriate state or federal governmental agency." The distributors' policies are also required to result in the "[r]eporting of criminal or suspected criminal activities involving the inventory of legend drugs to the [Indiana Board of Pharmacy] within three (3) business days." Ind. Code § 25-26-14-17(4)(K).

66.     Federal regulations, incorporated by Indiana law, Ind. Code § 25-26-14-17(10), further impose a non-delegable duty upon wholesale drug distributors to "design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant [distributor] shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b).

16

67.     "Suspicious orders" include orders of an unusual size, orders of unusual frequency or orders deviating substantially from a normal pattern.  *See* 21 CFR § 1301.74(b). These criteria are disjunctive and are not all inclusive.  For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a wholesale distributor need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious. The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the wholesale distributor's responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the wholesale distributor's customer base and the patterns throughout the relevant segment of the wholesale distributor industry.

68.     In addition to reporting all suspicious orders, distributors must also stop shipment on any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, the distributor can determine that the order is not likely to be diverted into illegal channels.  *See Southwood Pharm., Inc.,* 72 Fed. Reg. 36,487, 36,501 (Drug Enf't Admin. July 3, 2007); *Masters Pharmaceutical, Inc. v. Drug Enforcement Administration,* No. 15-11355 (D.C. Cir. June 30, 2017).  Regardless, all flagged orders must be reported.  *Id*.

69.     These prescription drugs are regulated for the purpose of providing a "closed" system **intended to reduce the widespread diversion of these drugs out of legitimate channels into the illicit market**, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.[32]

---

[32] *See* 1970 U.S.C.C.A.N. 4566, 4571-72.

70.     Different entities supervise the discrete links in the chain that separate a consumer from a controlled substance.   Statutes and regulations define each participant's role and responsibilities.[33]

71.     As the DEA advised the Distributor Defendants in a letter to them dated September 27, 2006, wholesale distributors are "one of the key components of the distribution chain. If the closed system is to function properly ... distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes. This responsibility is critical, as ... the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people."[34]

72.     The Distributor Defendants have admitted that they are responsible for reporting suspicious orders.[35]

73.     The DEA sent a letter to each of the Distributor Defendants on September 27, 2006, warning that it would use its authority to revoke and suspend registrations when appropriate. The letter expressly states that a distributor, ***in addition*** to reporting suspicious orders, has a

---

[33] Brief for Healthcare Distribution Management Association and National Association of Chain Drug Stores as Amici Curiae in Support of Neither Party, *Masters Pharm., Inc. v. U.S. Drug Enf't Admin.* (No. 15-1335) (D.C. Cir. Apr. 4, 2016), 2016 WL 1321983, at *22 [hereinafter Brief for HDMA and NACDS].  The Healthcare Distribution Management Association (HDMA or HMA) – now known as the Healthcare Distribution Alliance (HAD) – is a national, not-for-profit trade association that represents the nation's primary, full-service healthcare distributors whose membership includes, among others:  AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation.  *See generally* HAD, *About*, https://www.healthcaredistribution.org/about (last visited Aug. 21, 2017).  The National Association of Chain Drug Stores (NACDS) is a national, not-for-profit trade association that represents traditional drug stores and supermarkets and mass merchants with pharmacies whose membership includes, among others: Walgreen Company, CVS Health, Rite Aid Corporation and Walmart.  *See generally* NACDS, *Mission*, https://www.nacds.org/about /mission/ (last visited Aug. 21, 2017).

[34] *See* Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Sept. 27, 2006) [hereinafter Rannazzisi Letter] ("This letter is being sent to every commercial entity in the United States registered with the Drug Enforcement Agency (DEA) to distribute controlled substances. The purpose of this letter is to reiterate the responsibilities of controlled substance distributors in view of the prescription drug abuse problem our nation currently faces."), *filed in Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-51.

[35] *See* Brief for HDMA and NACDS, *supra* note 85, 2016 WL 1321983, at *4 ("[R]egulations . . . in place for more than 40 years require distributors to report suspicious orders of controlled substances to DEA based on information readily available to them (e.g., a pharmacy's placement of unusually frequent or large orders).").

"statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels."[36] The letter also instructs that "distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes."[37] The DEA warns that "even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm."[38]

74.    The DEA sent a second letter to each of the Distributor Defendants on December 27, 2007.[39] This letter reminds the Defendants of their statutory and regulatory duties to "maintain effective controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances."[40] The letter further explains:

> The regulation also requires that the registrant inform the local DEA Division Office of suspicious orders when discovered by the registrant. Filing a monthly report of completed transactions (e.g., "excessive purchase report" or "high unity purchases") does not meet the regulatory requirement to report suspicious orders. Registrants are reminded that their responsibility does not end merely with the filing of a suspicious order report. Registrants must conduct an independent analysis of suspicious orders prior to completing a sale to determine whether the controlled substances are likely to be diverted from legitimate channels. Reporting an order as suspicious will not absolve the registrant of responsibility if the registrant knew, or should have known, that the controlled substances were being diverted.
>
> The regulation specifically states that suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of an unusual frequency. These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a registrant need not wait for a "normal pattern" to develop over time before determining whether a particular order is suspicious. The size of an order alone, whether or not it deviates from a normal pattern, is enough to trigger the registrant's responsibility to report

---

[36] Rannazzisi Letter, *supra* note 83, at 2.

[37] *Id.* at 1.

[38] *Id.* at 2.

[39] *See* Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Dec. 27, 2007), filed in *Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-8.

[40] *Id.*

the order as suspicious. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer, but also on the patterns of the registrant's customer base and the patterns throughout the segment of the regulated industry.

Registrants that rely on rigid formulas to define whether an order is suspicious may be failing to detect suspicious orders. For example, a system that identifies orders as suspicious only if the total amount of a controlled substance ordered during one month exceeds the amount ordered the previous month by a certain percentage or more is insufficient. This system fails to identify orders placed by a pharmacy if the pharmacy placed unusually large orders from the beginning of its relationship with the distributor. Also, this system would not identify orders as suspicious if the order were solely for one highly abused controlled substance if the orders never grew substantially. Nevertheless, ordering one highly abused controlled substance and little or nothing else deviates from the normal pattern of what pharmacies generally order.

When reporting an order as suspicious, registrants must be clear in their communication with DEA that the registrant is actually characterizing an order as suspicious. Daily, weekly, or monthly reports submitted by registrant indicating "excessive purchases" do not comply with the requirement to report suspicious orders, even if the registrant calls such reports "suspicious order reports."

Lastly, registrants that routinely report suspicious orders, yet fill these orders without first determining that order is not being diverted into other than legitimate medical, scientific, and industrial channels, may be failing to maintain effective controls against diversion. Failure to maintain effective controls against diversion is inconsistent with the public interest as that term is used in 21 USC 823 and 824, and may result in the revocation of the registrant's DEA Certificate of Registration.[41]

Finally, the DEA letter references the Revocation of Registration issued in *Southwood Pharmaceuticals, Inc.*, 72 Fed. Reg. 36,487-01 (Drug Enf't Admin. July 3, 2007), which discusses the obligation to report suspicious orders and "some criteria to use when determining whether an order is suspicious."[42]

---

[41] *Id.*

[42] *Id.*

75.     The Distributor Defendants admit that they "have not only statutory and regulatory responsibilities to detect and prevent diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."[43]

76.     The Distributor Defendants knew they were required to monitor, detect, and halt suspicious orders. Industry compliance guidelines established by the Healthcare Distribution Management Association, the trade association of pharmaceutical distributors, explain that distributors are "[a]t the center of a sophisticated supply chain" and therefore "are uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers." The guidelines set forth recommended steps in the "due diligence" process, and note in particular: If an order meets or exceeds a distributor's threshold, as defined in the distributor's monitoring system, or is otherwise characterized by the distributor as an order of interest, the distributor should not ship to the customer, in fulfillment of that order, any units of the specific drug code product as to which the order met or exceeded a threshold or as to which the order was otherwise characterized as an order of interest.[44]

77.     Each of the Distributor Defendants sold prescription opioids, including hydrocodone and/or oxycodone, to retailers in Plaintiff's Community and/or to retailers from which Defendants knew prescription opioids were likely to be diverted to Plaintiff's Community.

78.     Each Distributor Defendant owes a duty to monitor and detect suspicious orders of prescription opioids.

---

[43] *See* Amicus Curiae Brief of Healthcare Distribution Management Association in Support of Appellant Cardinal Health, Inc., *Cardinal Health, Inc. v. United States Dep't of Justice*, No. 12-5061 (D.C. Cir. May 9, 2012), 2012 WL 1637016, at *2 (hereinafter Brief of HDMA).

[44] Healthcare Distribution Management Association (HDMA) *Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances, filed in Cardinal Health, Inc. v. Holder*, No. 12-5061 (D.C. Cir. Mar. 7, 2012), Doc. No. 1362415 (App'x B).

21

79.     Each Distributor Defendant owes a duty under federal and state law to investigate and refuse suspicious orders of prescription opioids.

80.     Each Distributor Defendant owes a duty under federal and state law to report suspicious orders of prescription opioids.

81.     Each Distributor Defendant owes a duty under federal and state law to prevent the diversion of prescription opioids into illicit markets in the State and Plaintiff's Community.

82.     The foreseeable harm resulting from a breach of these duties is the diversion of prescription opioids for nonmedical purposes and subsequent plague of opioid addiction.

83.     The foreseeable harm resulting from the diversion of prescription opioids for nonmedical purposes is abuse, addiction, morbidity and mortality in Plaintiff's Community and the damages caused thereby.

2.     The Distributor Defendants Breached Their Duties.

84.     Because distributors handle such large volumes of controlled substances, and are the first major line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, it is incumbent on distributors to maintain effective controls to prevent diversion of controlled substances. Should a distributor deviate from these checks and balances, the closed system collapses.[45]

85.     The sheer volume of prescription opioids distributed to pharmacies in the Plaintiff's Community, and/or to pharmacies from which the Distributor Defendants knew the opioids were likely to be diverted into Plaintiff's Community, is excessive for the medical need

---

[45] *See* Rannazzisi Decl. ¶ 10, filed in *Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-2.

21847146.1

of the community and facially suspicious. Some red flags are so obvious that no one who engages in the legitimate distribution of controlled substances can reasonably claim ignorance of them.[46]

86.     The Distributor Defendants failed to report "suspicious orders" originating from Plaintiff's Community, or which the Distributor Defendants knew were likely to be diverted to Plaintiff's Community, to the federal and state authorities, including the DEA and/or the state Board of Pharmacy.

87.     The Distributor Defendants unlawfully filled suspicious orders of unusual size, orders deviating substantially from a normal pattern and/or orders of unusual frequency in Plaintiff's Community, and/or in areas from which the Distributor Defendants knew opioids were likely to be diverted to Plaintiff's Community.

88.     The Distributor Defendants breached their duty to monitor, detect, investigate, refuse and report suspicious orders of prescription opiates originating from Plaintiff's Community, and/or in areas from which the Distributor Defendants knew opioids were likely to be diverted to Plaintiff's Community.

89.     The Distributor Defendants breached their duty to maintain effective controls against diversion of prescription opiates into other than legitimate medical, scientific, and industrial channels.

90.     The Distributor Defendants breached their duty to "design and operate a system to disclose to the registrant suspicious orders of controlled substances" and failed to inform the authorities including the DEA of suspicious orders when discovered, in violation of their duties under federal and state law.

---

[46] *Masters Pharmaceuticals, Inc.*, 80 Fed. Reg. 55,418-01, 55,482 (Sept. 15, 2015) (citing *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*, 77 Fed. Reg. 62,316, 62,322 (2012)).

21847146.1

91.     The Distributor Defendants breached their duty to exercise due diligence to avoid filling suspicious orders that might be diverted into channels other than legitimate medical, scientific and industrial channels.[47]

92.     The federal and state laws at issue here are public safety laws.

93.     The Distributor Defendants' violations of public safety statutes creates a presumption that the Defendants acted negligently under Indiana law. *Kho v. Pennington*, 875 N.E.2d 208, 212–13 (Ind. 2007) ("the unexcused violation of a statutory duty constitutes negligence *per se* 'if the statute or ordinance is tended to protect the class of persons in which the plaintiff is included and to protect against the risk of the type of harm which has occurred as a result of its violation.'" (citation omitted).

94.     The unlawful conduct by the Distributor Defendants is purposeful and intentional. The Distributor Defendants refuse to abide by the duties imposed by federal and state law which are required to legally acquire and maintain a license to distribute prescription opiates.

95.     The Distributor Defendants acted with actual malice in breaching their duties, *i.e.*, they have acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

96.     The Distributor Defendants' repeated shipments of suspicious orders, over an extended period of time, in violation of public safety statutes, and without reporting the suspicious orders to the relevant authorities demonstrates wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others and justifies an award of punitive damages.

---

[47] *See Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 206 (D.D.C. 2012).

### 3. The Distributor Defendants Have Sought to Avoid and Have Misrepresented Their Compliance with Their Legal Duties.

97. The Distributor Defendants have repeatedly misrepresented their compliance with their legal duties under state and federal law and have wrongfully and repeatedly disavowed those duties in an effort to mislead regulators and the public regarding the Distributor Defendants' compliance with their legal duties.

98. Distributor Defendants have refused to recognize any duty beyond *reporting* suspicious orders. In *Masters Pharmaceuticals*, the HDMA, a trade association ran by the Distributor Defendants, and the National Association of Chain Drug Stores ("NACDS") submitted amicus briefs regarding the legal duty of wholesale distributors inaccurately denying the legal duties that the wholesale drug industry has been tragically recalcitrant in performing. They argued as follows**:**

> a. The Associations complained that the "DEA has required distributors not only to report suspicious orders, but to *investigate* orders (e.g., by interrogating pharmacies and physicians) and take action to *halt* suspicious orders before they are filled."[48]

> b. The Associations argued that, "DEA now appears to have changed its position to require that distributors not only *report* suspicious orders, but *investigate* and *halt* suspicious orders. Such a change in agency position must be accompanied by an acknowledgement of the change and a reasoned explanation for it. In other words, an agency must display awareness that it *is* changing position and show that there are good reasons for the new policy. This is especially important here, because imposing intrusive obligation on distributors threatens to disrupt patient access to needed prescription medications."[49]

> c. The Associations alleged (inaccurately) that nothing "requires distributors to investigate the legitimacy of orders, or to halt shipment of any orders deemed to be suspicious."[50]

---

[48] Brief for Healthcare Distribution Management Association and National Association of Chain Drug Stores as Amici Curiae in Support of Neither Party, *Masters Pharm., Inc. v. U.S. Drug Enf't Admin.* (No. 15-1335) (D.C. Cir. Apr. 4, 2016), 2016 WL 1321983, at *4-5..

[49] *Id.* at *8 (citations and quotation marks omitted).

[50] *Id.* at *14.

d. The Association complained that the purported "practical infeasibility of requiring distributors to investigate and halt suspicious orders (as well as report them) underscores the importance of ensuring that DEA has complied with the APA before attempting to impose such duties."[51]

e. The Associations alleged (inaccurately) that "DEA's regulations [] sensibly impose[] a duty on distributors simply to *report* suspicious orders, but left it to DEA and its agents to investigate and halt suspicious orders."[52]

f. Also inaccurately, the Associations argued that, "[i]mposing a duty on distributors – which lack the patient information and the necessary medical expertise – to investigate and halt orders may force distributors to take a shot-in-the-dark approach to complying with DEA's demands."[53]

99. The positions taken by the trade groups are emblematic of the position taken by the Distributor Defendants in a futile attempt to deny their legal obligations to prevent diversion of the dangerous drugs.[54]

100. The Court of Appeals for the District of Columbia recently issued an opinion affirming that a wholesale drug distributor does, in fact, have duties beyond reporting. *Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206 (D.C. Cir. 2017). The D.C. Circuit Court upheld the revocation of Master Pharmaceutical's license and determined that DEA regulations require that in addition to reporting suspicious orders, distributors must "decline to ship the order, or conduct some 'due diligence' and—if it is able to determine that the order is not likely to be diverted into illegal channels—ship the order." *Id.* at 212. Master Pharmaceutical was in violation of legal requirements because it failed to conduct necessary investigations and filled suspicious orders. *Id.* at 218–19, 226. A distributor's investigation must dispel all the red flags giving rise to suspicious circumstance prior to shipping a suspicious order. *Id.* at 226. The Circuit Court also

---

[51] *Id.* at *22.
[52] *Id.* at *24–25.
[53] *Id.* at 26.
[54] *Id.* at 26.

rejected the argument made by the HDMA and NACDS (quoted above), that, allegedly, the DEA had created or imposed new duties. *Id*. at 220.

101.     Wholesale Distributor McKesson has recently been forced to specifically admit to breach of its duties to monitor, report, and prevent suspicious orders. Pursuant to an Administrative Memorandum of Agreement ("2017 Agreement") entered into between McKesson and the DEA in January 2017, McKesson admitted that, at various times during the period from January 1, 2009 through the effective date of the Agreement (January 17, 2017) it "did not identify or report to [the] DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters."[55] Further, the 2017 Agreement specifically finds that McKesson "distributed controlled substances to pharmacies even though those McKesson Distribution Centers should have known that the pharmacists practicing within those pharmacies had failed to fulfill their corresponding responsibility to ensure that controlled substances were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting in the usual course of their professional practice, as required by 21 C.F.R § 1306.04(a)."[56] McKesson admitted that, during this time period, it "failed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific and industrial channels by sales to certain of its customers in violation of the CSA and the CSA's implementing regulations, 21 C.F.R. Part 1300 *et seq*., at the McKesson Distribution Centers" including the McKesson Distribution Center located in "Washington Courthouse, Ohio."[57] Due to these violations, McKesson agreed that its authority to distribute

---

[55] *See* Administrative Memorandum of Agreement between the U.S. Dep't of Justice, the Drug Enf't Admin., and the McKesson Corp. (Jan. 17, 2017), https://www.justice.gov/opa/press-release/file/928476/download.
[56] *Id.* at 4.
[57] *Id.*

controlled substances from the Washington Courthouse, Ohio facility (among other facilities) would be partially suspended.[58]

102.    The 2017 Memorandum of Agreement followed a 2008 Settlement Agreement in which McKesson also admitted failure to report suspicious orders of controlled substances to the DEA.[59] In the 2008 Settlement Agreement, McKesson "recognized that it had a duty to monitor its sales of all controlled substances and report suspicious orders to DEA," but had failed to do so.[60] The 2017 Memorandum of Agreement documents that McKesson continued to breach its admitted duties by "fail[ing] to properly monitor its sales of controlled substances and/or report suspicious orders to DEA, in accordance with McKesson's obligations."[61] As a result of these violations, McKesson was fined and required to pay to the United States $150,000,000.[62]

103.    Even though McKesson was sanctioned in 2008 for failure to comply with its legal obligations regarding controlling diversion and reporting suspicious orders, and even though McKesson had specifically agreed in 2008 that it would no longer violate those obligations, McKesson continued to violate the laws in contrast to its written agreement not to do so.

104.    Because of the Distributor Defendants' refusal to abide by their legal obligations, the DEA has repeatedly taken administrative action to attempt to force compliance. For example, in May 2014, the United States Department of Justice, Office of the Inspector General, Evaluation and Inspections Divisions, reported that the DEA issued final decisions in 178 registrant actions

---

[58] *Id.* at 6.
[59] *Id.* at 4.
[60] *Id*.
[61] *Id.*; *see also* Settlement Agreement and Release between the U.S. and McKesson Corp., at 5 (Jan. 17, 2017) [hereinafter 2017 Settlement Agreement and Release] ("McKesson acknowledges that, at various times during the Covered Time Period [2009-2017], it did not identify or report to DEA certain orders placed by certain pharmacies, which should have been detected by McKesson as suspicious, in a manner fully consistent with the requirements set forth in the 2008 MOA."), https://www.justice.gov/opa/press-release/file/928471/download.
[62] *Id*. at 6.

between 2008 and 2012.[63] The Office of Administrative Law Judges issued a recommended decision in a total of 117 registrant actions before the DEA issued its final decision, including 76 actions involving orders to show cause and 41 actions involving immediate suspension orders.[64] These actions include the following:

a.  On April 24, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the AmerisourceBergen Orlando, Florida distribution center ("Orlando Facility") alleging failure to maintain effective controls against diversion of controlled substances. On June 22, 2007, AmerisourceBergen entered into a settlement that resulted in the suspension of its DEA registration;

b.  On November 28, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Auburn, Washington Distribution Center ("Auburn Facility") for failure to maintain effective controls against diversion of hydrocodone;

c.  On December 5, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of hydrocodone;

d.  On December 7, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Swedesboro, New Jersey Distribution Center ("Swedesboro Facility") for failure to maintain effective controls against diversion of hydrocodone;

e.  On January 30, 2008, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Stafford, Texas Distribution Center ("Stafford Facility") for failure to maintain effective controls against diversion of hydrocodone;

f.  On May 2, 2008, McKesson Corporation entered into an *Administrative Memorandum of Agreement* ("2008 MOA") with the DEA which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of

---

[63] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.
[64] *Id*.

suspicious orders required by 21 C.F.R. § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program";

g. On September 30, 2008, Cardinal Health entered into a *Settlement and Release Agreement and Administrative Memorandum of Agreement* with the DEA related to its Auburn Facility, Lakeland Facility, Swedesboro Facility and Stafford Facility. The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities located in McDonough, Georgia ("McDonough Facility"), Valencia, California ("Valencia Facility") and Denver, Colorado ("Denver Facility");

h. On February 2, 2012, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of oxycodone;

i. On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center; and

j. On January 5, 2017, McKesson Corporation entered into an *Administrative Memorandum Agreement* with the DEA wherein it agreed to pay a $150 million civil penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders at its facilities in Aurora CO, Aurora IL, Delran NJ, LaCrosse WI, Lakeland FL, Landover MD, La Vista NE, Livonia MI, Methuen MA, Sante Fe Springs CA, Washington Courthouse OH and West Sacramento CA.

105.    Rather than abide by their non-delegable duties under public safety laws, the Distributor Defendants, individually and collectively through trade groups in the industry, pressured the U.S. Department of Justice to "halt" prosecutions and lobbied Congress to strip the DEA of its ability to immediately suspend distributor registrations. The result was a "sharp drop in enforcement actions" and the passage of the "Ensuring Patient Access and Effective Drug Enforcement Act" which, ironically, raised the burden for the DEA to revoke a distributor's license

from "imminent harm" to "immediate harm" and provided the industry the right to "cure" any violations of law before a suspension order can be issued.[65]

106.    In addition to taking actions to limit regulatory prosecutions and suspensions, the Distributor Defendants undertook to fraudulently convince the public that they were complying with their legal obligations, including those imposed by licensing regulations. Through such statements, the Distributor Defendants attempted to assure the public they were working to curb the opioid epidemic.

107.    For example, a Cardinal Health executive claimed that it uses "advanced analytics" to monitor its supply chain, and represented that it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."[66] Given the sales volumes and the company's history of violations, this executive was either not telling the truth, or, if Cardinal Health had such a system, it ignored the results.

108.    Similarly, Defendant McKesson publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders," and claimed it is "deeply passionate about curbing the opioid epidemic in our country."[67] Again, given McKesson's

---

[65] *See* Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post, Mar. 6, 2017,https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html; Eric Eyre, *DEA Agent: "We Had No Leadership" in WV Amid Flood of Pain Pills*, Charleston Gazette-Mail, Feb. 18, 2017, http://www.wvgazettemail.com/news/20170218/dea-agent-we-had-no-leadership-in-wv-amid-flood-of-pain-pills-.

[66] Lenny Bernstein et al., *How Drugs Intended for Patients Ended Up in the Hands of Illegal Users: "No One Was Doing Their Job,"* Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html.

[67] Scott Higham et al., *Drug Industry Hired Dozens of Officials from the DEA as the Agency Tried to Curb Opioid Abuse*, Wash. Post, Dec. 22, 2016, https://www.washingtonpost.com/investigations/key-officials-switch-sides-from-dea-to-pharmaceutical-industry/2016/12/22/55d2e938-c07b-11e6-b527-949c5893595e_story.html.

31

historical conduct, this statement is either false, or the company ignored outputs of the monitoring program.

109.   By misleading the public about the effectiveness of their controlled substance monitoring programs, the Distributor Defendants successfully concealed the facts sufficient to arouse suspicion of the claims that the Plaintiff now asserts. The Plaintiff did not know of the existence or scope of Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

110.   Meanwhile, the opioid epidemic rages unabated in the Nation, the State, and in Plaintiff's Community.

111.   The epidemic still rages because the fines and suspensions imposed by the DEA do not change the conduct of the industry. The distributors, including the Distributor Defendants, pay fines as a cost of doing business in an industry that generates billions of dollars in annual revenue. They hold multiple DEA registration numbers and when one facility is suspended, they simply ship from another facility.

112.   The wrongful actions and omissions of the Distributor Defendants which have caused the diversion of opioids and which have been a substantial contributing factor to and/or proximate cause of the opioid crisis are alleged in greater detail in Plaintiff's racketeering allegations below.

113.   The Distributor Defendants have abandoned their duties imposed under federal and state law, taken advantage of a lack of DEA law enforcement, and abused the privilege of distributing controlled substances in the State and Plaintiff's Community.

32

### C. Distributor Defendants' Unlawful Conduct and Breaches of Legal Duties Caused the Harm Alleged Herein and Substantial Damages.

114. The Distributor Defendants have continued to unlawfully ship these massive quantities of opioids into communities like the Plaintiff's Community, fueling the epidemic.

115. There is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes."[68]

116. Opioid analgesics are widely diverted and improperly used, and the widespread use of the drugs has resulted in a national epidemic of opioid overdose deaths and addictions.[69]

117. The epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[70]

118. The increased abuse of prescription painkillers along with growing sales has contributed to a large number of overdoses and deaths.[71]

119. As shown above, the opioid epidemic has escalated in Plaintiff's Community with devastating effects. Substantial opiate-related substance abuse, hospitalization and death that mirrors Defendants' increased distribution of opiates.[72]

120. Because of the well-established relationship between the use of prescription opiates and the use of non-prescription opioids, like heroin, the massive distribution of opioids to Plaintiffs' Community and areas from which such opioids are being diverted into Plaintiff's

---

[68] *See* Richard C. Dart et al, *Trends in Opioid Analgesic Abuse and Mortality in the United States*, 372 N. Eng. J. Med. 241 (2015).

[69] *See* Nora D. Volkow & A. Thomas McLellan, *Opioid Abuse in Chronic Pain – Misconception and Mitigation Strategies*, 374 N. Eng. J. Med. 1253 (2016).

[70] *See* Robert M. Califf et al., *A Proactive Response to Prescription Opioid Abuse*, 374 N. Eng. J. Med. 1480 (2016).

[71] *See* Ctrs. For Disease Control and Prevention, U.S.Dep't of Health and Human Servs., Opioid Overdose, (December 16, 2016), https://www.cdc.gov/drugoverdose/data/statedeaths.html.

[72] Indiana State Dep. of Health, County Profiles of Opioid Use and Related Outcomes, available at https://www.in.gov/isdh/files/CountyProfilesOfOpioidUse2017.pdf.

21847146.1

Community, has caused the Defendant-caused opioid epidemic to include heroin addiction, abuse, and death.

121.    Prescription opioid abuse, addiction, morbidity, and mortality are hazards to public health and safety in the State and in Plaintiff's Community.

122.    Heroin abuse, addiction, morbidity, and mortality are hazards to public health and safety in the State and in Plaintiff's Community.

123.    Defendants repeatedly and purposefully breached their duties under state and federal law, and such breaches are direct and proximate causes of, and/or substantial factors leading to, the widespread diversion of prescription opioids for nonmedical purposes into the Plaintiff's Community.

124.    The unlawful diversion of prescription opioids is a direct and proximate cause of, and/or substantial factor leading to, the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality in the State and Plaintiff's Community. This diversion and the epidemic are direct causes of foreseeable harms incurred by the Plaintiff and Plaintiff's Community.

125.    Defendants intentional and/or unlawful conduct resulted in direct and foreseeable, past and continuing, economic damages for which Plaintiff seeks relief, as alleged herein. Plaintiff also seeks the means to abate the epidemic created by Defendants' wrongful and/or unlawful conduct.

126.    Plaintiff seeks economic damages from the Defendants as reimbursement for the costs association with past efforts to eliminate the hazards to public health and safety.

127.    Plaintiff seeks economic damages from the Defendants to pay for the cost to permanently eliminate the hazards to public health and safety and abate the temporary public nuisance.

128.     To eliminate the hazard to public health and safety, and abate the public nuisance, a "multifaceted, collaborative public health and law enforcement approach is urgently needed."[73]

129.     A comprehensive response to this crisis must focus on preventing new cases of opioid addiction, identifying early opioid-addicted individuals, and ensuring access to effective opioid addiction treatment while safely meeting the needs of patients experiencing pain.[74]

130.     These community-based problems require community-based solutions that have been limited by "budgetary constraints at the state and Federal levels."[75]

131.     Having profited enormously through the aggressive sale, misleading promotion, and irresponsible distribution of opiates, Defendants should be required to take responsibility for the financial burdens their conduct has inflicted upon the Plaintiff and Plaintiff's Community.

### D.  Statutes of Limitations Are Tolled and Distributor Defendants Are Estopped from Asserting Statutes of Limitations as Defenses.

#### 1.  Continuing Conduct.

132.     Plaintiff contends it continues to suffer harm from the unlawful actions by the Distributor Defendants.

133.     The continued tortious and unlawful conduct by the Distributor Defendants causes a repeated or continuous injury. The damages have not occurred all at once but have continued to occur and have increased as time progresses. The tort is not completed nor have all the damages been incurred until the wrongdoing ceases. The wrongdoing and unlawful activity by Distributor Defendants has not ceased. The public nuisance remains unabated.

---

[73] *See* Rose A. Rudd et al., *Increases in Drug and Opioid Overdose Deaths – United States*, 2000-2014, 64 Morbidity & Mortality Wkly. Rep. 1145 (2016).
[74] *See* Johns Hopkins Bloomberg School of Public Health, *The Prescription Opioid Epidemic: An Evidence-Based Approach* (G. Caleb Alexander et al. eds., 2015), http://www.jhsph.edu/research/centers-and-institutes/center-for-drug-safety-and-effectiveness/research/prescription-opioids/JHSPH_OPIOID_EPIDEMIC_REPORT.pdf.
[75] *See* Office of Nat'l Drug Control Policy, Exec. Office of the President, *Epidemic: Responding to America's Prescription Drug Abuse Crisis* (2011), https://www.ncjrs.gov/pdffiles1/ondcp/rx_abuse_plan.pdf.

2.   Equitable Estoppel.

134.    Distributor Defendants are equitably estopped from relying upon a statute of limitations defense because they undertook efforts to purposefully conceal their unlawful conduct and fraudulently assure the public, including the State, the Plaintiff, and Plaintiff's Community, that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting their registered manufacturer or distributor status in the State and to continue generating profits. Notwithstanding the allegations set forth above, the Distributor Defendants affirmatively assured the public, including the State, the Plaintiff, and Plaintiff's Community, that they are working to curb the opioid epidemic.

135.    For example, a Cardinal Health executive claimed that it uses "advanced analytics" to monitor its supply chain, and assured the public it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity." [76]

136.    Similarly, McKesson publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders," and claimed it is "deeply passionate about curbing the opioid epidemic in our country." [77]

137.    Moreover, in furtherance of their effort to affirmatively conceal their conduct and avoid detection, the Distributor Defendants, through their trade associations, HDMA and NACDS, filed an *amicus* brief in *Masters Pharmaceuticals*, which made the following statements: [78]

---

[76] Lenny Bernstein et al., *How Drugs Intended for Patients Ended Up in the Hands of Illegal Users: "No One Was Doing Their Job,"* Wash. Post, Oct. 22, 2016, https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html.

[77] Scott Higham et al., *Drug Industry Hired Dozens of Officials from the DEA as the Agency Tried to Curb Opioid Abuse,* Wash. Post, Dec. 22, 2016, https://www.washingtonpost.com/investigations/key-officials-switch-sides-from-dea-to-pharmaceutical-industry/2016/12/22/55d2e938-c07b-11e6-b527-949c5893595e_story.html.

[78] Brief for Healthcare Distribution Management Association and National Association of Chain Drug Stores as Amici Curiae in Support of Neither Party, *Masters Pharm., Inc. v. U.S. Drug Enf't Admin*. (No. 15-1335) (D.C. Cir. Apr. 4, 2016), 2016 WL 1321983, at *3-4, *25.

a.  "HDMA and NACDS members not only have statutory and regulatory responsibilities to guard against diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."

b.  "DEA regulations that have been in place for more than 40 years require distributors to *report* suspicious orders of controlled substances to DEA based on information readily available to them (e.g., a pharmacy's placement of unusually frequent or large orders)."

c.  "Distributors take seriously their duty to report suspicious orders, utilizing both computer algorithms and human review to detect suspicious orders based on the generalized information that *is* available to them in the ordering process."

d.  "A particular order or series of orders can raise red flags because of its unusual size, frequency, or departure from typical patterns with a given pharmacy."

e.  "Distributors also monitor for and report abnormal behavior by pharmacies placing orders, such as refusing to provide business contact information or insisting on paying in cash."

138.  Through the above statements made on their behalf by their trade associations, and other similar statements assuring their continued compliance with their legal obligations, the Distributor Defendants not only acknowledged that they understood their obligations under the law, but they further affirmed that their conduct was in compliance with those obligations.

139.  The Distributor Defendants have also concealed and prevented discovery of information, including data from the ARCOS database, that will confirm their identities and the extent of their wrongful and illegal activities.

140.  The Plaintiff and Plaintiff's Community reasonably relied on the Distributor Defendants' affirmative statements regarding their purported compliance with their obligations under the law and consent orders.

3.  Fraudulent Concealment.

141.  The Plaintiff's claims are further subject to equitable tolling, stemming from Defendants' knowingly and fraudulently concealing the facts alleged herein. As alleged herein, Defendants knew of the wrongful acts set forth above, and had material information pertinent to

37

their discovery, and concealed them from the Plaintiff and Plaintiff's community. The Plaintiff did not know, or could not have known through the exercise of reasonable diligence, of its cause of action, as a result of Defendants' conduct.

142.     The purposes of the statutes of limitations period are satisfied because Defendants cannot claim prejudice due to a late filing where the Plaintiff filed suit promptly upon discovering the facts essential to its claims, described herein, which Defendants knowingly concealed.

143.     In light of their statements to the media, in legal filings, and settlements, it is clear that Defendants had actual or constructive knowledge that their conduct was deceptive, in that they consciously concealed the schemes set forth herein

144.     Defendants continually and secretly engaged in their scheme to avoid compliance with their legal obligations. Only Defendants and their agents knew or could have known about Defendants' unlawful actions because Defendants made deliberate efforts to conceal their conduct. As a result of the above, the Plaintiff was unable to obtain vital information bearing on its claims absent any fault or lack of diligence on its part.

## V.     Legal Causes of Action

### COUNT I
### PUBLIC NUISANCE

145.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

146.     Plaintiff brings an action under Indiana's common law and a statutory nuisance action under Indiana Code section 32-30-6 *et seq.*, which provides that, "Whatever is (1) injurious to health; (2) indecent; (3) offensive to the senses; or (4) an obstruction to the free use of property; so as essentially to interfere with the comfortable enjoyment of life or property, is a nuisance, and

the subject of an action." Ind. Code § 32-30-6-6. Such an action "may . . . be brought by . . . an attorney representing the county in which a nuisance exists." Ind. Code § 32-30-6-7(b)(1). "A county, city, or town that brings a successful action under this section to abate or enjoin a nuisance is entitled to recover reasonable attorney's fees incurred in bringing the action." Ind. Code § 32-30-6-7(c).

147.    Plaintiff alleges that Defendants wrongful and illegal actions have created a public nuisance. Each Defendant is liable for public nuisance because its conduct at issue has caused an unreasonable interference with a right common to the general public.

148.    The Defendants have intentionally and/or unlawfully created a general nuisance throughout Plaintiff's Community, and myriad specific nuisances from the effects of the opioid epidemic throughout Plaintiff's Community.

149.    The residents of Plaintiff's Community have a common right to be free from conduct that creates an unreasonable jeopardy to the public health, welfare and safety, and to be free from conduct that creates a disturbance to the enjoyment of their property.

150.    Defendants intentionally, unlawfully, and recklessly distribute, and sell prescription opioids that Defendants know, or reasonably should know, will be diverted, causing widespread distribution of prescription opioids in and/or to Plaintiff's Community, resulting in addiction and abuse, an elevated level of crime, death and injuries to the residents of Plaintiff's Community, a higher level of fear, discomfort and inconvenience to the residents of Plaintiff's Community, and direct costs to Plaintiff's Community. Defendants' willful decisions to maximize their profit by distributing opioids into Plaintiff's Community, beyond any reasonable medical or other lawful necessity, were reasonably and naturally calculated to injure the general public or visitors to Plaintiff's Community.

151.    Defendants have unlawfully and/or intentionally caused and permitted dangerous drugs under their control to be diverted such as to injure the Plaintiff's Community and its residents.

152.    Defendants have unlawfully and/or intentionally distributed opioids or caused opioids to be distributed without maintaining effective controls against diversion. Such conduct was illegal. Defendants' failures to maintain effective controls against diversion include Defendants' failure to effectively monitor for suspicious orders, report suspicious orders, and/or stop shipment of suspicious orders.

153.    Defendants have caused a significant and unreasonable interference with the public health, safety, welfare, peace, comfort and convenience, and ability to be free from disturbance of the enjoyment of property.

154.    Defendants' conduct in illegally distributing and selling prescription opioids, or causing such opioids to be distributed and sold, where Defendants know, or reasonably should know, such opioids will be diverted and possessed and/or used illegally Plaintiff's Community is of a continuing nature.

155.    Defendants' actions have been of a continuing nature and have produced a significant effect upon the public's rights, including the public's right to health and safety.

156.    A violation of any rule or law controlling the distribution of a drug of abuse in Plaintiff's Community and the State is a public nuisance.

157.    Defendants' distribution of opioids while failing to maintain effective controls against diversion was proscribed by statute and regulation.

158.     Defendants' ongoing conduct produces an ongoing nuisance, as the prescription opioids that they allow and/or cause to be illegally distributed and possessed in Plaintiff's Community will be diverted, leading to abuse, addiction, crime, and public health costs.

159.     Because of the continued use and addiction caused by these illegally distributed opioids, the public will continue to fear for its health, safety and welfare, and will be subjected to conduct that creates a disturbance and reasonable apprehension of danger to person and property.

160.     Defendants know, or reasonably should know, that their conduct will have an ongoing detrimental effect upon the public health, safety and welfare, and the public's ability to be free from disturbance of their enjoyment of property.

161.     Defendants know, or reasonably should know, that their conduct causes an unreasonable invasion of the public right to health, safety and welfare and the public's ability to be free from disturbance in the enjoyment of their property. These effects flow reasonably and naturally from Defendants' willful choices.

162.     Defendants are aware, and at a bare minimum certainly should be aware, of the unreasonable interference that their conduct has caused in Plaintiff's Community. Defendants are in the business of manufacturing, marketing, selling, and distributing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous under federal law. *See*, e.g., 21 U.S.C. § 812 (b)(2).

163.     Defendants' conduct in marketing, distributing, and selling prescription opioids which the defendants know, or reasonably should know, will likely be diverted for non-legitimate, non-medical use, creates a strong likelihood that these illegal distributions of opioids will cause death and injuries to residents in Plaintiff's Community and otherwise significantly and

unreasonably interfere with public health, safety and welfare, and with the public's right to be free from disturbance of the enjoyment of property.

164.    It is, or should be, reasonably foreseeable to defendants that their conduct will cause deaths and injuries to residents in Plaintiff's Community, and will otherwise significantly and unreasonably interfere with public health, safety and welfare, and with the public's right to be free from disturbance of the enjoyment of property.

165.    The prevalence and availability of diverted prescription opioids in the hands of irresponsible persons and persons with criminal purposes in Plaintiff's Community not only causes deaths and injuries, but also creates a palpable climate of fear among residents in Plaintiff's Community where opioid diversion, abuse, addiction are prevalent and where diverted opioids tend to be used frequently.

166.    Defendants' conduct makes it easier for persons to divert prescription opioids, constituting a dangerous threat to the public.

167.    Defendants' actions were, at the least, a substantial factor in opioids becoming widely available and widely used for non-medical purposes. Because of Defendants' special positions within the closed system of opioid distribution, without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

168.    The presence of diverted prescription opioids in Plaintiff's Community, and the consequence of prescription opioids having been diverted in Plaintiff's Community, proximately results in significant costs to the Plaintiff and to Plaintiff's Community in order to enforce the law, equip its police force and treat the victims of opioid abuse and addiction.

21847146.1

169.    Stemming the flow of illegally distributed prescription opioids, and abating the nuisance caused by the illegal flow of opioids, will help to alleviate this problem, save lives, prevent injuries and make Plaintiff's Community a safer place to live.

170.    Defendants' conduct is a direct and proximate cause of deaths and injuries to the residents of Plaintiff's Community, costs borne by Plaintiff's Community and the Plaintiff, and a significant and unreasonable interference with public health, safety and welfare, and with the public's right to be free from disturbance.

171.    Defendants' conduct constitutes a public nuisance and, if unabated, will continue to threaten the health, safety and welfare of the residents of Plaintiff's Community, creating an atmosphere of fear and addiction that tears at the residents' sense of well-being and security. Plaintiff has a clearly ascertainable right to abate conduct that perpetuates this nuisance.

172.    Defendants' actions created and expanded the abuse of opioids, which are dangerously addictive, and the ensuing associated plague of prescription opioid and heroin addiction. Defendants knew the dangers to public health and safety that diversion of opioids would create in Plaintiff's Community, however, Defendants intentionally and/or unlawfully failed to maintain effective controls against diversion through proper monitoring, reporting and refusal to fill suspicious orders of opioids. Defendants intentionally and/or unlawfully distributed opioids or caused opioids to be distributed without reporting or refusing to fill suspicious orders or taking other measures to maintain effective controls against diversion. Defendants intentionally and/or unlawfully continued to ship and failed to halt suspicious orders of opioids, or caused such orders to be shipped. Defendants intentionally and/or unlawfully marketed opioids in manners they knew to be false and misleading. Such actions were inherently dangerous.

43

173.    Defendants knew the prescription opioids have a high likelihood of being diverted. Diversion was foreseeable, reasonable, and naturally occurring result of Defendants' choice to distribute prescription opioids or to cause such opioids to be distributed without maintaining effective controls against diversion, including monitoring, reporting, and refusing shipment of suspicious orders; it was just as foreseeable, reasonable, and natural that such diversion would in turn create an opioid abuse nuisance in Plaintiff's Community.

174.    Defendants also acted recklessly, negligently and/or carelessly, in breach of their duties to maintain effective controls against diversion, thereby creating an unreasonable risk of harm.

175.    Defendants acted with the reasonable and natural calculation of creating, maintaining, and allowing a general nuisance because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

176.    The damages available to the Plaintiff include, *inter alia*, recoupment of governmental costs, flowing from an ongoing and persistent public nuisance which the government seeks to abate. Defendants' conduct is ongoing and persistent, and the Plaintiff seeks all damages flowing from Defendants' conduct. Plaintiff further seeks to abate the nuisance and harm created by Defendants' conduct.

177.    As a direct result of Defendants' conduct, the Plaintiff and Plaintiff's Community have suffered actual injury and damages including, but not limited to, significant expenses for police, emergency, health, prosecution, corrections and other services. The Plaintiff here seeks recovery for its own harm.

178.    The Plaintiff and Plaintiff's Community have sustained specific and special injuries because its damages include, inter alia, health services, law enforcement expenditures, and costs related to opioid addiction treatment and overdose prevention.

179.    The Plaintiff further seeks to abate the nuisance created by the Defendants' unreasonable, unlawful, intentional, ongoing, continuing, and persistent actions and omissions and interference with a right common to the public.

180.    Plaintiff seeks all legal and equitable relief as allowed by law, including inter alia abatement, compensatory damages, and punitive damages from the Defendants for the creation of a public nuisance, attorney fees and costs, and pre- and post-judgment interest.

181.    Defendants' intentional and unlawful actions and omissions and unreasonable interference with a right common to the public are of a continuing nature.

182.    Defendants are aware, and at a bare minimum certainly should be aware, of the unreasonable interference that their conduct has caused in the Plaintiff's community. Defendants are in the business of manufacturing or distributing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous because *inter alia* these drugs are defined under federal and state law as substances posing a high potential for abuse and severe addiction. Defendants created an absolute nuisance. Defendants' actions created and expanded the abuse of opioids, drugs specifically codified as constituting severely harmful substances.

183.    The public nuisance created by Defendants' actions is substantial and unreasonable—it has caused and continues to cause significant harm to the community, and the harm inflicted outweighs any offsetting benefit. The staggering rates of opioid and heroin use resulting from the Defendants' abdication of their gate-keeping and diversion prevention duties, have caused harm to the entire community that includes, but is not limited to:

45

a.   The high rates of use leading to unnecessary opioid abuse, addiction, overdose, injuries, and deaths.

b.   Even children have fallen victim to the opioid epidemic. Easy access to prescription opioids made opioids a recreational drug of choice among teenagers. Even infants have been born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts.

c.   Even those residents of Plaintiff's Community who have never taken opioids have suffered from the public nuisance arising from Defendants' abdication of their gate-keeper duties and fraudulent promotions. Many residents have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids.

d.   The opioid epidemic has increased health care costs.

e.   Employers have lost the value of productive and healthy employees.

f.   Defendants' conduct created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury.

g.   Defendants' dereliction of duties and/or fraudulent misinformation campaign pushing dangerous drugs resulted in a diverted supply of narcotics to sell, and the ensuing demand of addicts to buy them. More prescription opioids sold by Defendants led to more addiction, with many addicts turning from prescription opioids to heroin. People addicted to opioids frequently require increasing levels of opioids, and many turned to heroin as a foreseeable result.

h.   The diversion of opioids into the secondary, criminal market and the increased number of individuals who abuse or are addicted to opioids increased the demands on health care services and law enforcement.

i.   The significant and unreasonable interference with the public rights caused by Defendants' conduct taxed the human, medical, public health, law enforcement, and financial resources of the Plaintiff's Community.

j.   Defendants' interference with the comfortable enjoyment of life in the Plaintiff's Community is unreasonable because there is little social utility to opioid diversion and abuse, and any potential value is outweighed by the gravity of the harm inflicted by Defendants' actions.

184.    The Plaintiff and Plaintiff's Community have sustained specific and special injuries because its damages include *inter alia* health services and law enforcement expenditures, as described in this Complaint.

185.    Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' fraudulent activity and fraudulent misrepresentations. Plaintiff does not seek damages for the wrongful death, physical personal injury, serious emotional distress, or any physical damage to property caused by Defendants' actions.

186.    Plaintiff seeks all legal and equitable relief as allowed by law, other than such damages disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

**COUNT II**
**INDIANA CRIME VICTIM RELIEF ACT**
**INDIANA CODE SECTION 34-24-3-1**
**(Deception)**

187.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

188.    Defendants' unlawful conduct has caused Plaintiff to suffer extensive pecuniary losses.

189.    Defendants' conduct falls under the provisions of Indiana Code article 43.

190.    Defendants committed deception, Ind. Code § 35-43-5-3(a)(2), by knowingly making false and misleading written statements with the intent to obtain property.  Specifically, Defendants applied for licenses from the Indiana Board of Pharmacy by making the representation that they would comply with their reporting obligations under federal and state law.

191.     As detailed above, Defendants had no intention of complying with these mandatory legal requirements. Their licenses were acquired through deceit, and enabled Defendants to obtain tremendous amounts of money in the State.

192.     Plaintiff seeks all legal and equitable relief as allowed by law, including *inter alia*, injunctive relief, full compensatory and punitive or exemplary damages, and all damages allowed by law to be paid by Distributor Defendants.

## COUNT III
## NEGLIGENCE AND NEGLIGENT MISREPRESENTATION

193.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here-in, and further alleges as follows.

194.     Plaintiff seeks economic damages which were the foreseeable result of Defendants' intentional and/or unlawful actions and omissions.

195.     Under Indiana law, to establish actionable negligence, one must show in addition to the existence of a duty, a breach of that duty, and injury resulting proximately therefrom. All such essential elements exist here.

196.     Each Defendant had an obligation to exercise reasonable care in manufacturing, marketing, selling, and distributing highly dangerous opioid drugs to the State and Plaintiff's Community.

197.     Each Defendant had an obligation to exercise due care in selling and distributing highly dangerous opioid drugs in the State and Plaintiff's Community.

198.     The existence of a duty depends on the foreseeability of the injury. Each Defendant owed a duty to the Plaintiff and to Plaintiff's Community because the injuries alleged herein was foreseeable, and in fact foreseen, by the Defendants.

21847146.1

199.     Reasonably prudent distributors of prescription opioids would have anticipated that the scourge of opioid addiction would wreak havoc on communities, and the significant costs which would be imposed upon the governmental entities associated with those communities. The closed system of opioid distribution whereby wholesale distributors are the gatekeepers between manufacturers and pharmacies, and wherein all links in the chain have a duty to prevent diversion, exists for the purpose of controlling dangerous substances such as opioids and preventing diversion and abuse.

200.     Moreover, Defendants were repeatedly warned by law enforcement of the unlawfulness and consequences of their actions and omissions.

201.     The escalating amounts of addictive drugs flowing through Defendants' businesses, and the sheer volume of these prescription opioids, further alerted Defendants that addiction was fueling increased consumption and that legitimate medical purposes were not being served.

202.     As described above in language expressly incorporated herein, Distributor Defendants breached their duties to exercise due care in the business of wholesale distribution of dangerous opioids, which are Schedule II Controlled Substances, by failing to monitor for, failing to report, and filling highly suspicious orders time and again. Because the very purpose of these duties was to prevent the resulting harm – diversion of highly addictive drugs for nonmedical purposes – the causal connection between Defendants' breach of duties and the ensuing harm was entirely foreseeable.

203.     As described elsewhere in the Complaint in language expressly incorporated herein, Distributor Defendants misrepresented their compliance with their duties under the law and concealed their noncompliance and shipments of suspicious orders of opioids to Plaintiff's

49

Community and destinations from which they knew opioids were likely to be diverted into Plaintiff's Community, in addition to other misrepresentations alleged and incorporated herein.

204. All Defendants breached their duties to prevent diversion and report and halt suspicious orders, and all Defendants misrepresented their compliance with their legal duties.

205. Defendants' breaches were intentional and/or unlawful, and Defendants' conduct was willful, wanton, malicious, reckless, oppressive, and/or fraudulent.

206. The causal connection between Defendants' breaches of duties and misrepresentations and the ensuing harm was entirely foreseeable.

207. As described above in language expressly incorporated herein, Defendants' breaches of duty and misrepresentations caused, bears a causal connection with, and/or proximately resulted in the damages sought herein.

208. Defendants were selling dangerous drugs statutorily categorized as posing a high potential for abuse and severe dependence. Defendants' knowingly traded in drugs that presented a high degree of danger if prescribed incorrectly or diverted to other than medical, scientific, or industrial channels. However, Defendants breached their duties to monitor for, report, and halt suspicious orders, breached their duties to prevent diversion, and, further, misrepresented what their duties were and their compliance with their legal duties.

209. Defendants' unlawful and/or intentional actions create a rebuttable presumption of negligence under State law.

210. Plaintiff seeks losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' actions and omissions. Plaintiff does not seek damages for the wrongful death, physical personal injury, serious emotional distress, or any physical damage to property caused by Defendants' actions.

50

211.    Plaintiff seeks all legal and equitable relief as allowed by law, other than such damages disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

## COUNT IV
## NEGLIGENCE PER SE

212.    Plaintiff re-alleges all prior paragraphs of this Complaint as if set forth fully herein.

213.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

214.    Indiana Code sections 25-26-14-7, 25-26-14-14, 25-26-14-17(10), 25-26-14-17(4)(K), as well as the federal laws and regulations concerning wholesale drug distributors, are laws aimed at public safety. Each Defendant had a duty under, *inter alia,* these laws maintain effective controls against diversion of prescription opioids and to guard against, prevent, and report suspicious orders of opioids. Plaintiff is within the class of persons for whom an injury would foreseeably occur if Defendants violated their statutory and regulatory duties.

215.    Defendants' actions and omissions in violation of the law constitute negligence per se.

216.    Defendants' actions and omissions were intentional and/or unlawful, and Defendants acted with actual malice.

217.    It was foreseeable that the breach of duty described herein would result in the economic damages for which Plaintiff seeks recovery.

218.    As described above in language expressly incorporated herein, Defendants breached their duties to maintain effective controls against diversion of dangerously addictive opioids, including violating public safety statutes requiring that as wholesale drug distributors,

51

Defendants could only distribute these dangerous drugs under a closed system – a system Defendants were responsible for guarding.

219.    As described above in language expressly incorporated herein, Defendants' breach of statutory and regulatory duties caused, bears a causal connection with, and proximately resulted in, harm and damages sought by the Plaintiff.

220.    Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' negligence per se. Plaintiff does not seek damages for the wrongful death, physical personal injury, serious emotional distress, or any physical damage to property caused by Defendants' actions.

221.    Plaintiff seeks all legal and equitable relief as allowed by law, except as expressly disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Distributor Defendants, attorney fees and costs, and pre- and post-judgment interest.

## COUNT V
## DECEPTIVE TRADE PRACTICES
## COMMON LAW AND INDIANA CODE CHAPTER 24-5-0.5-2

222.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

223.    Defendants violated Indiana Code chapter 24-5.05-2, because they engaged in the deceptive trade practices detailed above in Indiana.

224.    Defendants committed repeated and willful unfair, abusive, or deceptive acts or practices, and unconscionable trade practices, in connection with consumer transactions.

225.    Defendants are all "suppliers" as that term is defined in Indiana Code section 24-5-0.5-2(a)(3).  Plaintiff falls under the definition of "person" in Indiana Code section 24-5-0.5-2(a)(2).

226.    Defendants' conduct constitutes "incurable deceptive acts" as that term is defined in Indiana Code section 24-5-0.5-2(a)(8), because all of the Defendants' acts detailed in this Complaint were done "as part of a scheme, artifice, or device with intent to defraud or mislead."

227.    Indiana's Deceptive Consumer Sales chapter explicitly prohibits the Defendants from soliciting to engage in a consumer transaction if a permit for that transaction would be required but "the supplier is not qualified to obtain the required permit or other license."  Ind. Code § 24-5-0.5-10(a)(1)(B). Defendants, as a condition of their continued licensure in the state of Indiana, were required to report suspicious transactions to the DEA and other relevant authorities; accordingly, every transaction they entered into was deceptive as Defendants were not qualified to obtain their licenses from the Indiana Pharmacy Board, and the Defendants knew they were not qualified for their licenses.

228.    As a "person" under the Deceptive Consumer Sales chapter, Plaintiff is entitled to recover, at a minimum, the damages it has actually suffered from Defendants' deceptive trade practices.  However, because Defendants' conduct was willfully deceptive, Plaintiff is entitled to three times its actual damage.

## COUNT VI
## CIVIL CONSPIRACY

229.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

230.    While Indiana does not recognize a separate civil cause of action for conspiracy, there *is* a civil cause of action for damages resulting from a conspiracy. *Miller v. Cent. Ind.*

53

*Community Found., Inc.*, 11 N.E.3d 944, 962 (Ind. Ct. App. 2014).  It is another way of asserting concerted action in the commission of a tort. *Id.*

231.    Defendants' torts detailed above were committed in concert of action with each other.

232.    Defendants engaged in a civil conspiracy to create a public nuisance in conjunction with their unlawful distribution and diversion of opioids into the State and Plaintiff's Community.

233.    As set forth herein, Defendants engaged in a civil conspiracy to commit fraud and misrepresentation in conjunction with their unlawful distribution and diversion of opioids into the State and Plaintiff's Community.

234.    Distributor and Manufacturer Defendants unlawfully failed to act to prevent diversion and failed to monitor for, report, and prevent suspicious orders of opioids.

235.    Defendants' conspiracy and acts in furtherance thereof are alleged in greater detail earlier in the complaint, including, without limitation, in Plaintiff's federal and state law racketeering allegations. Such allegations are incorporated herein.

236.    Defendants acted with a common understanding or design to commit unlawful acts, as alleged herein, and acted purposely, without a reasonable or lawful excuse, to create the injuries alleged herein.

237.    Defendants acted with malice, purposely, intentionally, unlawfully, and without a reasonable or lawful excuse.

238.    Defendants' conspiracy, and Defendants' actions and omissions in furtherance thereof, caused the direct and foreseeable losses alleged herein.

239.    Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' civil conspiracy. Plaintiff does not seek damages for the

wrongful death, physical personal injury, serious emotional distress, or any physical damage to property caused by Defendants' actions.

240.    Plaintiff seeks all legal and equitable relief as allowed by law, except as expressly disavowed herein, including inter alia injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Distributor Defendants, attorney fees and costs, and pre- and post-judgment interest.

## COUNT VII
## DRUG DEALER LIABILITY
## INDIANA CODE SECTION 34-24-4-1

241.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

242.    Pursuant to Indiana Code section 34-24-4-1, a person who knowingly participates is civilly liable for certain damages.

243.    As described herein, Defendants' intentional failure to comply with their reporting requirements under federal and State law created, as a foreseeable consequence, an incredible number of individuals who are now addicted to drugs. These drugs users in turn have forced Plaintiff to expend funds on drug treatment programs, assistance programs, and other expenditures described herein.

244.    Indiana Code section 34-24-4-2 provides that a "governmental entity" like Plaintiff may recoup costs from those who participated in the creation and maintenance of the black market for opioid drugs in Plaintiff's Community.

245.    Defendants are liable for these costs, as they are "person[s] who knowingly distributed or knowingly participated in the chain of distribution of an illegal drug that was actually used by . . . individual drug user[s]." Ind. Code § 34-24-4-3(1).

55

246.     Accordingly, Plaintiff is entitled to recover from Defendants the myriad damages described in Indiana Code section 34-24-4-4, including but not limited to treatment and rehabilitation costs, loss of economic potential, accidents, emotional distress, anguish, as well as exemplary damages, attorney fees, and court costs.

## COUNT VIII
## FRAUD AND FRAUDULENT MISREPRESENTATION

247.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

248.     Defendants violated their general duty not to actively deceive, and have made knowingly false statements and have omitted and/or concealed information which made statements Defendants did make knowingly false. Defendants acted intentionally and/or unlawfully.

249.     As alleged herein, Defendants made false statements regarding their compliance with state and federal law regarding their duties to prevent diversion, their duties to monitor, report and halt suspicious orders, and/or concealed their noncompliance with these requirements.

250.     As alleged herein, Defendants knowingly and/or intentionally made representations that were false. Defendants had a duty to disclose material facts and concealed them. These false representations and concealed facts were material to the conduct and actions at issue. Defendants made these false representations and concealed facts with knowledge of the falsity of their representations, and did so with the intent of misleading Plaintiff, Plaintiff's community, the public, and persons on whom Plaintiff relied.

251.     These false representations and concealments were reasonably calculated to deceive Plaintiff, Plaintiff's Community, and the physicians who prescribed opioids for persons in Plaintiff's Community, were made with the intent to deceive, and did in fact deceive these persons, Plaintiff, and Plaintiff's Community.

56

252.     Plaintiff, Plaintiff's Community, and the physicians who prescribed opioids reasonably relied on these false representations and concealments of material fact.

253.     Plaintiff justifiably relied on Defendants' representations and/or concealments, both directly and indirectly. Plaintiff's injuries were proximately caused by this reliance.

254.     The injuries alleged by Plaintiff herein were sustained as a direct and proximate cause of Defendants' fraudulent conduct.

255.     Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' fraudulent activity, including fraudulent misrepresentations and fraudulent concealment. Plaintiff does not seek damages for the wrongful death, physical personal injury, serious emotional distress, or any physical damage to property caused by Defendants' actions.

256.     Plaintiff seeks all legal and equitable relief as allowed by law, except as expressly disavowed herein, including inter alia injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Distributor Defendants, attorney fees and costs, and pre- and post-judgment interest.

### VI.     PUNITIVE DAMAGES

257.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges.

258.     By engaging in the above-described unfair acts or practices, Defendants acted with actual malice, wantonly, and oppressively. Defendants acted with conscious disregard to the rights of others and/or in a reckless, wanton, willful, or gross manner. Defendants acted with a prolonged indifference to the adverse consequences of their actions and/or omissions. Defendants acted with a conscious disregard for the rights and safety of others in a manner that had a great probability of

causing substantial harm.  Here, Defendants were selling dangerous drugs statutorily categorized as posing a high potential for abuse and severe dependence. Thus, Defendants knowingly traded in drugs that presented a high degree of danger if prescribed incorrectly or diverted to other than legitimate medical, scientific, or industrial channels. Because of the severe level of danger posed by, and indeed visited upon the State and Plaintiff's Community by, these dangerous drugs, Defendants owed a high duty of care to ensure that these drugs were only used for proper medical purposes. Defendants chose profit over prudence, and the safety of the community, and an award of punitive damages is appropriate, as punishment and a deterrence.

259.    By engaging in the above-described wrongful conduct, Defendants also engaged in willful misconduct and exhibited an entire want of care that would raise the presumption of a conscious indifference to consequences.

## VII.    RELIEF

**WHEREFORE**, the Plaintiff respectfully prays that this Court grant the following relief:

1.    Entering Judgment in favor of the Plaintiff in a final order against each of the Defendants;

2.    Enjoining the Defendants and their employees, officers, directors, agents, successors, assignees, merged or acquired predecessors, parent or controlling entities, subsidiaries, and all other persons acting in concert or participation with it, from engaging in unfair or deceptive practices in violation of law and ordering temporary, preliminary or permanent injunction;

3.    Order that Defendants compensate the Plaintiff for past and future costs to abate the ongoing public nuisance caused by the opioid epidemic;

4.    Order Defendants to fund an "abatement fund" for the purposes of abating the opioid nuisance;

5.   Awarding actual damages, treble damages, injunctive and equitable relief, forfeiture as deemed proper by the Court, and attorney fees and all costs and expenses of suit pursuant to Plaintiff's racketeering claims;

6.   Awarding the Plaintiff the damages caused by the opioid epidemic, including

    a.   costs for providing medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

    b.   costs for providing treatment, counseling, and rehabilitation services;

    c.   costs for providing treatment of infants born with opioid-related medical conditions;

    d.   costs for providing care for children whose parents suffer from opioid-related disability or incapacitation; and

    e.   costs associated with law enforcement and public safety relating to the opioid epidemic.

7.   Awarding judgment against the Defendants requiring Defendants to pay punitive damages;

8.   Granting the Plaintiff

    a.   The cost of investigation, reasonable attorneys' fees, and all costs and expenses;

    b.   Pre-judgment and post-judgment interest; and,

    c.   All other relief as provided by law and/or as the Court deems appropriate and just.

Respectfully submitted,

*/s/ Chou-il Lee*

Chou-il Lee [# 21183-53]
Manuel "Manny" Herceg [# 29956-06]
Taft Stettinius & Hollister LLP
3500 One Indiana Square
Indianapolis, IN 46204
(317) 713-3500
clee@taftlaw.com
mherceg@taftlaw.com

Counsel for Plaintiff Town of Atlanta

Pro hac vice applications will be filed shortly for the following:

Paul T. Farrell, Jr.
**GREENE, KETCHUM, FARRELL,**
    **BAILEY & TWEEL, LLP**
419 - 11th Street (25701)/ P.O. Box 2389
Huntington, West Virginia 25724-2389
Tel.: 800-479-0053 or 304-525-9115
Fax: 304-529-3284
paul@greeneketchum.com

Peter J. Mougey
**LEVIN, PAPANTONIO, THOMAS, MITCHELL,**
    **RAFFERTY & PROCTOR, P.A.**
316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
Tel.: 850-435-7068
Fax: 850-436-6068
pmougey@levinlaw.com

R. Edison Hill
**HILL, PETERSON, CARPER,**
    **BEE & DEITZLER, PLLC**
NorthGate Business Park
500 Tracy Way
Charleston, WV  25311
Tel.: 304-345-5667
Fax: 304-345-1519
rehill@hpcbd.com

J. Burton LeBlanc
**BARON & BUDD, P.C.**
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Tel.: 214-521-3605
Fax: 214-520-1181
bleblanc@baronbudd.com

Michael J. Fuller, Jr.
**MCHUGH FULLER LAW GROUP, PLLC**
97 Elias Whiddon Rd.
Hattiesburg, MS  39402
Tel.: 601-261-2220
Fax: 601-261-2481
mike@mchughfuller.com

Anthony J. Majestro
**POWELL & MAJESTRO, PLLC**
405 Capitol Street, Suite P-1200
Charleston, WV 25301
Tel.: 304-346-2889
Fax: 304-346-2895
amajestro@powellmajestro.com